William ROSE, Jr.; Orie Reed,
Plaintiffs–Appellants,

v.

WELLS FARGO & COMPANY,
Defendant–Appellee.

No. 88–15569.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1990.

Decided May 8, 1990.

Margaret Kemp–Williams, Chinello, Chinello, Shelton & Auchard, Fresno, Cal., for plaintiffs-appellants.

Eric K. Hansen, Jory, Peterson & Sagaser, Fresno, Cal., for defendant-appellee.

Before WALLACE, ALARCON and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

William Rose, Jr. and Orie Reed bring this action against their employer, Wells Fargo & Company (Wells Fargo), alleging they were discharged on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634 (West 1985 & Supp.1990), and the California Fair Employment and Housing Act, Cal. Gov't Code § 12941 (West Supp.1990). The plaintiffs also allege a state law claim for breach of the implied covenant of good faith and fair dealing. Rose and Reed appeal from the district court's orders granting summary judgment in favor of Wells Fargo. We affirm.

## FACTS AND PROCEEDINGS

In February 1986, Wells Fargo purchased Crocker National Bank from Midland Bank and announced its plan to merge Crocker's banking operations with its own. The consolidated banking entity was to be known as Wells Fargo Bank, N.A. The proposed merger was the largest of its kind in history, affecting 15,000 Wells Fargo employees and 13,000 Crocker employees.

Following the merger announcement, Wells Fargo set about combining the two enterprises. Because Wells Fargo and Crocker were comparable in size and offered essentially the same types of banking services within the same geographic market, the merger meant that most duplicative job positions would be eliminated. Employees were told from the beginning the merger would mean the elimination of jobs and the displacement of employees. Job losses fell hardest on Crocker employees; nearly one fifth of the Crocker work force lost their jobs as a direct result of the merger.

Before the merger, fifty-three year old William Rose worked as a vice president in the Agricultural Unit of Crocker's Special Assets Division ("SAD") located in Fresno, California (the "Fresno Ag Unit"). He conducted appraisals and assisted in the management of agricultural properties which secured loans made by Crocker. Approximately seventy-five percent of the properties Rose worked on were assets of the Bracton Corporation, a subsidiary of Midland Bank. Rose had worked for Crocker for fifteen years and had received "Excellent" ratings in his last four job evaluations.

Orie Reed, also a Crocker vice president prior to the merger, was the manager of the Fresno Ag Unit. Fifty-six year old Reed managed problem agricultural loans and the properties which secured them. His primary responsibility, however, was to supervise the Fresno Ag Unit. Reed had worked for Crocker for twenty-seven years and consistently received high ratings in his most recent job evaluations.

The merger necessitated a consolidation of SAD with the comparable Wells Fargo office, the Loan Adjustment Department ("LAD"). On February 25, 1986, SAD's Executive Vice President, Richard Daniel, circulated a letter which assured his employees "there [was] no thought of reducing staff in [SAD]." Shortly before the

merger, however, Wells Fargo announced that it would not manage the Bracton assets, which formerly had made up approximately sixty percent of the total assets managed by SAD. In addition, all of SAD's other property management functions were transferred to other units within Wells Fargo.

The loss of the Bracton assets and the transfer of SAD's property management functions led to substantial staff reductions within SAD. Approximately half of the 153 pre-merger SAD employees lost their jobs as a result of the merger. Four of the eight SAD management employees, including Rose and Reed, were terminated. Reed and Rose learned on June 2, 1986, two days after the effective date of the acquisition, that they had been terminated due to job elimination.

Employment decisions as to which jobs would be eliminated and as to who would fill the remaining positions was essentially left to the discretion of the managers of the various bank departments. Robert Walker, senior vice president of SAD, made the final recommendations regarding Rose's and Reed's termination. While some placement services were made available to Rose and Reed, they were not interviewed for, nor were they offered, a new position within the reorganized bank.

Rose and Reed thereafter filed this action against Wells Fargo alleging age discrimination under both federal and state law, and breach of the implied covenant of good faith and fair dealing. In October 1988, the district court granted Wells Fargo's separate motions for summary judgment on all three claims. After bringing an unsuccessful motion for reconsideration, Rose and Reed timely filed this appeal.

## DISCUSSION

### I. Federal Discrimination Claim

A grant of summary judgment is reviewed de novo. *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir.1986). Viewing the evidence in a light most favorable to the non-moving party, the reviewing court must determine if there are any genuine issues of material fact and whether the law was correctly applied. *Id.* "Although summary procedures should be used prudently, 'particularly in cases involving issues of motivation or intent' in ADEA claims, such relief may nonetheless be appropriate." *Id.* (quoting *Douglas v. Anderson*, 656 F.2d 528, 535 (9th Cir. 1981)).

Rose and Reed claim they were discriminated against on the basis of age in violation of ADEA, 29 U.S.C. § 623(a)(1), which makes it unlawful "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." This prohibition applies to "individuals who are at least 40 ... but less than 70 years of age." 29 U.S.C. § 631(a).

■■■ The shifting burden of proof applied to a Title VII discrimination claim also applies to claims arising under ADEA. *Palmer*, 794 F.2d at 537. The plaintiff must first establish a prima facie case of discrimination, which, for the purposes of summary judgment, "refers to the plaintiff's burden of 'producing enough evidence to permit the trier of fact to infer the fact at issue.'" *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981)).[1] Establishment of a prima facie case operates to shift the burden to the employer to produce some evidence that it had legitimate, nondiscriminatory reasons for the employment decision. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). If the employer "carries this burden of production, the plaintiff must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by the defendant were a pretext for discrimination." *Id.* While the

---

**1.** The burden of establishing a prima facie case is not designed to be "onerous" and only requires the production of evidence which "*sug-* gests*" that the employment decision was based on age. *Diaz v. American Tel. & Tel.*, 752 F.2d 1356, 1361 (9th Cir.1985).

burden shifts, " '[t]he ultimate burden of persuading the trier of fact that the defendant ... discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ A plaintiff alleging discrimination under ADEA may proceed under two theories of liability: disparate treatment or disparate impact. *Palmer,* 794 F.2d at 536. Proof of disparate treatment requires a showing that the employer treats some people less favorably than others because of their age. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). In contrast, discriminatory motive or intent need not be shown under a disparate impact theory, which challenges facially neutral employment practices which have a discriminatory impact. *Id.* However, under the latter theory the plaintiff must actually prove the discriminatory impact at issue, rather than merely an inference of discriminatory impact. *Palmer,* 794 F.2d at 536.

## A. Disparate Treatment

■ Rose and Reed claim Wells Fargo refused to retain them during the work force reduction because of their age. An employee may establish a prima facie case of age discrimination under the disparate treatment theory by showing he: (1) was a member of the protected class [age 40–70]; (2) was performing his job in a satisfactory manner; (3) was discharged; and (4) was replaced by a substantially younger employee with equal or inferior qualifications. *Id.* at 537 (quotation omitted).

Both Rose and Reed established that they are members of the protected class, that they were performing their jobs satisfactorily, and that they were discharged. The district court dismissed their disparate treatment claims on the grounds they

> failed to show actual discrimination under the disparate treatment theory because their entire unit was eliminated during the merger as Wells Fargo did not acquire the property owned by Crocker which was managed by this unit.

Thus, these plaintiffs were not replaced by anyone, let alone younger persons with similar qualifications.

The plaintiffs argue that proof of replacement is not required as part of their prima facie case where the termination results from a reduction in work force.

■ We have held that the failure to prove replacement by a younger employee is "not necessarily fatal" to an age discrimination claim where the discharge results from a general reduction in the work force due to business conditions. *See id.* (citing *Haydon v. Rand Corp.,* 605 F.2d 453, 454 n. 1 (9th Cir.1979) (per curiam)). Most circuits are in accord and require instead that the plaintiff show through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination. *See e.g., Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103–04 (2d Cir.1989); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 n. 1 (8th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Mauter v. Hardy Corp.,* 825 F.2d 1554, 1557 (11th Cir.1987); *Williams v. General Motors Corp.,* 656 F.2d 120, 128–29 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). *See also Oxman v. WLS–TV,* 846 F.2d 448, 453–56 (7th Cir. 1988). However,

> [i]n a reduction-in-force case, there is no adverse inference to be drawn from an employee's discharge if his position and duties are completely eliminated.... If [the discharged employee] cannot show that [his employer] had some continuing need for his skills and services in that his various duties were still being performed, then the basis of his claim collapses.

*Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1270 (8th Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). *Accord Sengupta v. Morrison–Knudsen Co.,* 804 F.2d 1072, 1075 (9th Cir.1986) (plaintiff's prima facie case "crumble[s]" unless he can demonstrate a continuing need for the same services and skills).

■ Rose has not demonstrated a continuing need for his same services within the reorganized bank. It is undisputed that most of Rose's responsibilities were eliminated due to the loss of the Bracton accounts. Rose has otherwise presented no facts which controvert Walker's deposition testimony that he was discharged because "the job that he did in S.A.D. [was] not performed in L.A.D." Moreover, there is no evidence to suggest that Rose's admittedly "unique function" was needed elsewhere at Wells Fargo. Rose's limited duties as vice president were also duplicative of functions performed by Wells Fargo's own managers prior to the merger.[2] Rose does not claim that his counterpart at Wells Fargo's was younger or somehow less qualified than he.

■ There is evidence that many of Reed's responsibilities were eventually assumed by a younger co-worker. However, the fact that this did not occur until six or seven months after Reed's discharge "substantially weaken[s]" his claim. *See Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 941 (6th Cir.1987) (replacement three months after discharge in corporate reorganization case). Under these circumstances, "a plaintiff must come forward with additional direct, circumstantial, or statistical evidence that age was a factor in his termination." *Id.* (quotation omitted).

Rose and Reed argue an intent to discriminate on the basis of age may be inferred from: (1) Wells Fargo's failure to follow its own written procedures regarding staff reduction; (2) its treatment of the plaintiffs in regards to relocation within the reorganized bank; (3) Walker's reference to the plaintiffs as part of the "old boy network;" and (4) statistical evidence of age discrimination.

■ The plaintiffs contend that Wells Fargo failed to follow its own displacement process outlined in the "Reduction–In–Force and Re–Employment Strategies ... A Manager's Guide" (or "RIF Manual") which states: "Displacement of employees should be based first on job performance, and second on length of service." However, rather than referring to decisions whether to eliminate persons within certain positions, these criteria were to be used in determining who would be assigned to the positions retained by the reorganized bank.[3] Thus, the RIF Manual is not probative of any intent to discriminate on the basis of age in the decisions to eliminate the jobs held by Rose and Reed.

The plaintiffs argue an inference of discrimination is also raised with respect to Wells Fargo's failure to interview them or consider them for other positions within the reorganized bank. In an interrogatory answer, Wells Fargo stated that Crocker employees whose positions were eliminated "would either be displaced at or about the time of the acquisition, or would be offered available positions, as appropriate." Displacement was to be based on length of service and performance. Rose and Reed claim that while efforts were made to place some younger employees in other jobs within the bank, no such efforts were made with respect to them even though they were willing and qualified.

■ "When an employer reduces its work force for economic reasons, it incurs no duty to transfer the employee to another position within the company." *Simpson*, 823 F.2d at 942 n. 6. To the extent Wells Fargo voluntarily assumed such a duty by its actions and/or statements in the RIF Manual, an inference of discrimination is raised where the terminat-

---

2. As the acquiring bank, Wells Fargo chose to retain its own management personnel in favor of duplicative Crocker management, "unless a Crocker employee possess[ed] skills and experience which his/her Wells Fargo counterpart lack[ed]."

3. The provision at issue provides in full:
Once you've determined what jobs will be required, you'll need to make specific staffing decisions about *who* your staff will be. The Staff Analysis Worksheet will assist you in: Assigning staff to regular or temporary positions, determining who will be displaced. Wells Fargo's policy is to plan for reductions in a way that insures there is no adverse impact on any single class except for business necessity. Displacement of employees should be based first on job performance, and second on length of service.

ed employee "can show that *others not in the protected class were treated more favorably." Oxman,* 846 F.2d at 455. The plaintiffs, however, have not identified a single younger employee who was relocated after his Crocker job was eliminated. Moreover, the plaintiffs have not identified a specific job elsewhere in the consolidated bank which they claim they should have gotten instead of an employee outside the protected class. Under these circumstances, we see no evidence which suggests the plaintiffs were denied the benefits of any programs because of their age or that they were treated less favorably then similarly-situated younger employees.

■ Walker's reference to Rose and Reed "as part of an old-boy network within Crocker" is also insufficient to create an inference of age discrimination. "Old-boy network" is generally considered a colloquialism unrelated to age. Thus, Walker's reference to the plaintiffs as part of that network does not raise a negative inference as to age.

Finally, Rose and Reed submit the findings of Dr. William Mallios [4] who concluded, after conducting a statistical analysis of Wells Fargo's employment decisions, that the single most important factor in predicting retention or termination in SAD or at the vice-president level was age. Wells Fargo's "Age Data" also show that of the thirty-four employees fifty years or older within SAD, twenty-five (or 73.5%) were terminated, while the figure was only 34.1% for persons between the ages of forty and forty-nine and 28.2% for those under forty.

■ We find these statistics insufficient in themselves to create a triable issue of fact of intent to discriminate. "For [the plaintiffs] to show a prima facie case of disparate treatment based solely on statistics [they] must show a stark pattern of discrimination unexplainable on grounds other than age." *Palmer,* 794 F.2d at 539 (quotation omitted). A great proportion of job displacement occurred at the management level because Wells Fargo chose to replace duplicative Crocker management with existing Wells Fargo management. The statistical disparity in regards to termination rates is explained by the fact older persons tend to occupy these key management positions. Wells Fargo also offers statistics which show that the average age and mix of the banks' employees prior to and after the consolidation were approximately the same.[5] These figures indicate a lack of age discrimination during the reorganization.

After a review of the entire record, we conclude that Rose and Reed have failed to establish a prima facie case of disparate treatment. There is no evidence to suggest that age was considered in the decisions to discharge the plaintiffs. Moreover, even if the statistical evidence and the evidence of replacement six months following the merger arguably support an inference of discrimination with respect to Reed, we find that evidence insufficient to support a jury verdict on the ultimate question of discrimination. Wells Fargo offered as a legitimate nondiscriminatory reason for their discharge the general reduction in work force due to job elimination and business necessity. Accordingly, the district court properly granted summary judgment on the plaintiffs' disparate treatment claims.

B. Disparate Impact

"A disparate impact claim challenges 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477,

4. Dr. Mallios is a Doctor of Philosophy with a degree in Experimental Statistics and is presently a professor at California State University at Fresno.

5. The average age of Wells Fargo and Crocker employees before the merger was 35.80 and 36.61, respectively. The average age of employees of the consolidated bank 22 months after the merger was 36.77. In addition, 36.47% of the Crocker work force and 32.09% of the Wells Fargo work force were 40 years or older while 34.8% of the work force was 40 or older after the consolidation.

1480 (9th Cir.1987) (en banc) (quoting *Teamsters*, 431 U.S. at 336 n. 15, 97 S.Ct. at 1855), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). Illicit motive or intent "is irrelevant because impact analysis is designed to implement Congressional concern with 'the *consequences* of employment practices, not simply the motivation.'" *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)). Rather, the focus in a disparate impact case is usually "on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988).

█ In order to establish a prima facie case of disparate impact, the plaintiff must: (1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *See id.* 108 S.Ct. at 2788–89. The statistical disparities "must be sufficiently substantial that they raise such an inference of causation." *Id.* at 2789. The "significance" or "substantiality" of numerical disparities is judged on a case by case basis. *Id.* at 2789 n. 3.

█ Once the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant who may either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists. *Id.* at 2790. The employer may also produce evidence that its disparate employment practices are based on legitimate business reasons, such as job-relatedness or business necessity. *Id.* Thereafter, "the plaintiff must 'show that other tests or selection devices, without a

similarly undesirable [discriminatory] effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.'" *Id.* (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

The district court dismissed the plaintiffs' disparate impact claims on the grounds they "fail[ed] to show a specific, facially neutral employment practice necessary for the disparate impact theory, and have not established a prima facie case because the terminations were based on the eliminations of plaintiffs' jobs and not because of their age."

█ The disparate impact analysis may be applied to challenge both objective and subjective employment practices or criteria. *Id.* 108 S.Ct. at 2786–87; *Atonio*, 810 F.2d at 1483. In *Watson*, the Supreme Court held an employer's facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees was a specific employment practice properly subject to a disparate impact analysis.[6] 108 S.Ct. at 2786–87. Selection systems that combine both subjective and objective criteria are generally considered subjective in nature. *Id.* at 2786.

█ Rose and Reed identify the outwardly neutral practice as "[t]he process Wells Fargo describes by which it selected employees to be terminated [which] involved a subjective determination by department heads regarding the positions or persons to be eliminated." Appellants' Brief at 11. Wells Fargo admits that the authority to determine which jobs would be eliminated and as to who would fill the remaining positions was delegated to the department heads. While the managers were instructed to consider an employee's performance and longevity, Wells Fargo admits that the process of job elimination and restaffing was otherwise discretionary and subjective. Accordingly, as in *Watson*, Wells Fargo's policy of committing employment decisions to the subjective discretion

---

**6.** The Supreme Court explained that "[i]f an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply." *Id.* 108 S.Ct. at 2786–87.

of its managers is a specific employment practice subject to a disparate impact analysis.

■ Nonetheless, while Rose and Reed have sufficiently identified a facially neutral employment practice, they have failed to prove that practice caused the termination of older Crocker employees because of their age. Dr. Mallios' statistics only show that Crocker vice presidents and persons over fifty within SAD were terminated at a higher rate than younger SAD employees. As previously noted, the statistical disparities can be explained by nondiscriminatory factors—older persons tended to occupy the duplicative management positions eliminated by Wells Fargo during the reorganization. In fact, the statistics proffered by Wells Fargo show that the work force for the consolidated bank was slightly older than the pre-merger Crocker work force. Under these circumstances, we conclude there is insufficient evidence that Wells Fargo's employment practices had a disproportionate impact on persons over fifty specifically because of age. Accordingly, Wells Fargo is entitled to summary judgment on the plaintiffs' claims of disparate impact.

## II. California Discrimination Claim

Under California's age discrimination statute, Cal. Gov't Code § 12941(a) (West 1990), it is "an unlawful employment practice for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age, except in cases where the law compels or provides for such action."

Rose and Reed argue that the California courts apply a less rigorous standard than applied by the federal courts in Title VII actions. Specifically, age discrimination must be a "motivating factor" in the employer's decision under federal law, while it need only be "one of the factors that influenced" the employer under California law. *See Department of Fair Employment & Housing v. Church's Fried Chicken, Inc.,* FEHC Dec. No. 87–18 at 10 (1987). Hence, they contend that the district court erred in

granting summary judgment on the state discrimination claim.

■ Rose and Reed's argument is without merit. There is no evidence to suggest that age was even a factor in the decisions to discharge the plaintiffs. Rather, the plaintiffs, as with many other SAD employees, lost their jobs because their services were not needed by the consolidated bank. The plaintiffs' claims thus fail under both standards.

## III. Implied Covenant of Good Faith and Fair Dealing

Rose and Reed allege a state law claim for breach of the implied covenant of good faith and fair dealing. Rose and Reed allege that Wells Fargo impliedly promised they would not be discharged "without cause." Amended Complaint at 3. Wells Fargo also:

impliedly promised [them] pursuant to its procedures, custom and practice, that they would not be terminated or laid off due to any company reorganization or elimination of their positions. In part, such promises were made by adhering to a custom and practice of finding positions elsewhere in the organization for employees whose positions were eliminated through no fault of their own.

*Id.* Wells Fargo allegedly breached those implied promises by failing to make reasonable efforts to relocate them within the bank and in "fail[ing] to give any consideration to its policies, customs and practices of retaining employees with greater seniority and superior performance in preference of junior inferior performers." *Id.* at 5–6. Rose and Reed seek pecuniary damages as well as damages for mental and emotional distress.

On October 13, 1988, the district court granted summary judgment in favor of Wells Fargo on this state law claim. The district court found the plaintiffs were "at will" officers or employees of the bank and were therefore "subject to termination with or without good cause." Moreover, the plaintiffs failed to offer "any evidence of an express or implied agreement not to terminate plaintiffs or that their positions

would not be eliminated, or any bad faith on the part of defendant."

■ "There is an implied covenant of good faith and fair dealing in *every* contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 453, 168 Cal.Rptr. 722, 728 (1980) (quoting *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal.2d 654, 658, 328 P.2d 198, 200 (1958)). In the insurance context, the California Supreme Court has held that a breach of this implied covenant by the insurer gives rise to a tort cause of action, as well as an action for breach of contract. *See Crisci v. Security Ins. Co.,* 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967). However, recently in *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), the supreme court reversed a long line of cases which permitted a tort cause of action to employees who allege they were discharged in violation of the implied covenant. Therefore, the plaintiffs' action is barred to the extent they seek tort remedies.[7]

In rejecting the existence of a tort cause of action for breach of implied covenant in the context of an employment relationship, the court in *Foley* did not discuss the parameters of an action sounding in contract for breach of the implied covenant. Therefore, the existing case law regarding the conduct that may be actionable as a breach of the implied covenant may still be valid in establishing a breach of contract action.

■ Rose and Reed allege that Wells Fargo impliedly promised not to eliminate their positions or discharge them except for cause. However, when an employment contract *expressly* provides that it may be terminated at will or for any reason, as the employment contract indisputably did here, the covenant of good faith and fair dealing cannot be used to imply a requirement for good cause to terminate. *See Foley,* 47 Cal.3d at 698 n. 39, 254 Cal.Rptr. at 238 n. 39, 765 P.2d at 400 n. 39. Rather, the

implied covenant may only be used to supply a requirement of good cause for termination when the contract between the parties is silent or ambiguous on that subject. *Gerdlund v. Electronic Dispensers Int'l,* 190 Cal.App.3d 263, 277, 235 Cal.Rptr. 279, 286 (1987) (court may not imply an obligation which would obliterate a right expressly given under a written contract). Hence, this portion of the plaintiffs' claim fails.

■ Rose and Reed also allege a cause of action for Wells Fargo's alleged breach of their implied promise to consider them for other positions within the reorganized bank. In *Hejmadi v. AMFAC, Inc.,* 202 Cal.App.3d 525, 551, 249 Cal.Rptr. 5, 20 (1988), the court articulated the elements of a cause of action for breach of the implied covenant based on the termination of an at-will employment relationship: (1) the employee's expectation of benefit from the contract; (2) that the expectation of benefit is not dependent upon a continuous employment relationship which can only be terminated for cause; and (3) a bad-faith termination coupled with the wrongful intent of the employer to deprive the employee of that benefit of the agreement. Under these circumstances, "[t]here exists a bargained for contractual benefit which the employee has reason to expect will be observed by the employer in good faith." *Id.*

Rose and Reed maintain they had a legitimate expectation that, based on their prior performance and length of service, Wells Fargo would at least consider them for relocation within the bank. This expectation arose from statements in the RIF Manual and from Wells Fargo's attempts to relocate other displaced Crocker employees. Wells Fargo argues that it never adopted a formal policy of shifting employees whose jobs were eliminated into new positions. Rather, the RIF Manual made it clear that absent extraordinary circumstances, job elimination meant complete dis-

---

7. The court subsequently held that *Foley* applied retroactively to all cases not yet final on the date that opinion became final (January 30, 1989). *Newman v. Emerson Radio Corp.,* 48 Cal.3d 973, 993, 258 Cal.Rptr. 592, 605, 772 P.2d 1059, 1072 (1989).

placement.[8]

While a triable issue of fact may exist over whether a reassignment policy or practice did exist, there are no facts to support the plaintiffs' allegations that Wells Fargo terminated them in bad faith or that it intended to deprive them of the benefit of that practice. The evidence establishes that the plaintiffs were terminated because the services they provided were not needed by the consolidated bank. Summary judgment on this claim was therefore proper.

AFFIRMED.

8. Ted Tolton, a Wells Fargo personnel officer, explained:

> In short, "seniority" as used [in] the RIF Manual became a factor in making displacement decisions only where employees within the same job function were competing for a limited number of available positions. If Wells Fargo made the decision to eliminate a particular job function altogether, then neither performance nor seniority was a factor for the simple reason that there was no job to fill. Appellee's Brief at 39.