958 F.2d 377
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Farley FLYNN and Glenn Butler, Plaintiffs-Appellants
v.
PORTLAND GENERAL ELECTRIC COMPANY, Defendant-Appellee
 No. 90-35891.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 7, 1992.
Decided March 23, 1992.
 
 Before JAMES R. BROWNING, D.W. NELSON and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 Appellants Farley Flynn and Glenn Butler appeal the district court's summary judgment dismissal of their action against Portland General Electric Company (PGE) for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Flynn also appeals the dismissal of his state law claim for breach of an implied employment contract under Oregon law. Flynn and Butler, both long-term employees of PGE, were not hired to fill positions in PGE's new marketing department, which was created following a company-wide reorganization that abolished the department in which the two men had previously worked. Because the appellants have failed to establish a prima facie case of either discriminatory impact or discriminatory intent, we affirm the district court's grant of summary judgment on the ADEA claims. Furthermore, because Flynn has failed to raise a genuine issue of material fact as to the creation of an employment contract for lifetime employment, we affirm the grant of summary judgment on Flynn's contract claim as well.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 Appellant Farley Flynn began working at PGE as a meter reader in 1958 and transferred to the sales department (later renamed the Customer Field Service Department) in 1963. Butler was hired by PGE as an engineer in 1967, and transferred to the sales department in 1977. Both men served as representatives in the Customer Field Service (CFS) Department until their termination by PGE in 1986.
 
 
 4
 Beginning in the early 1980s, PGE became concerned that it was losing a significant share of the energy market to natural gas. As part of its efforts to revamp and revitalize its sales and marketing strategies, PGE created a new marketing division with a new organizational structure consisting of four functional departments. All non-union jobs that had existed in the old division, including those of Flynn and Butler, were abolished.
 
 
 5
 PGE established a committee to review the staffing needs of the new department and to determine whether the positions to be filled were "new" jobs or the functional equivalent of pre-existing jobs. If a job was determined to be the equivalent of a pre-existing job, the incumbents from the pre-existing jobs would simply be transferred into those positions. If a job was determined to be "new," the job was opened to company-wide bidding. PGE compared the former CFS representative job with the newly-created position of Sales Associate and determined that the Sales Associate position was new.
 
 
 6
 Once the Sales Associate position had been determined to be new, the executives of the Marketing and Sales Department developed the selection criteria to be used in hiring the sales force. The two sales managers and a sales consultant concluded that a number of "below the line" attributes were the most important determinants of success in sales. In order to ferret out those candidates with the desirable attributes, PGE developed a six-part questionnaire to be used in personal interviews with each job applicant. Each interview was conducted by a team of two sales supervisors, and a nine-member selection committee then met as a group to score the applicants' answers. The applicants were ranked according to their scores, and the candidates with the fifty highest scores were evaluated further before employment offers were made to thirty-four candidates.
 
 
 7
 Seventy-seven candidates applied for the Sales Associate position, nine of whom were eliminated in an initial screen because they had no sales experience. Twenty-one of the remaining applicants were former CFS representatives. Sixteen were hired as Sales Associates and five, including Flynn and Butler, were rejected.[1] The average age of the successful former CFS representatives was 37.5 years and the average age of the unsuccessful representatives 48.6 years. Moreover, the average annual salary of the successful CFS applicants was $38,367, while the unsucessful applicants earned an annual average of $41,930. Finally, the appellants allege that, in the year prior to their termination, Flynn had performance appraisal scores higher than fifteen of the sixteen successful CFS applicants and Butler had scores higher than thirteen of the candidates.
 
 
 8
 Because Flynn and Butler were unsuccessful in obtaining positions with the restructured PGE, they were terminated by the company in September 1986. Each man filed a separate charge of age discrimination with the EEOC in early 1987. Following an investigation, the EEOC concluded that there was no evidence of age discrimination in the decisions not to hire and then to terminate Flynn and Butler, and issued each man a right to sue letter. Flynn and Butler filed this lawsuit in April 1988 and PGE moved for summary judgment. Judge Helen Frye, after concluding that the statistical, direct, and circumstantial evidence of discrimination proffered by Flynn and Butler was not sufficiently probative of either discriminatory impact or discriminatory treatment, granted summary judgment in favor of the defendants. This appeal followed.
 
 
 9
 STANDARD OF REVIEW.
 
 
 10
 A grant of summary judgment is reviewed de novo. Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 110 S.Ct. 3217 (1990). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989); Judie v. Hamilton, 872 F.2d 919, 920 (9th Cir.1989). "Although summary procedures should be used prudently, 'particularly in cases involving issues of motivation or intent' in ADEA claims, such relief may nonetheless be appropriate." Palmer v. United States, 794 F.2d 534, 536 (9th Cir.1986) (quoting Douglas v. Anderson, 656 F.2d 528, 535 (9th Cir.1981)).
 
 DISCUSSION
 1. Disparate Impact
 
 11
 The ADEA, 29 U.S.C. § 623(a)(1), makes it unlawful "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." This prohibition applies to "individuals who are at least 40 ... but less than 70 years of age." 29 U.S.C. § 631(a).
 
 
 12
 A plaintiff alleging discrimination under the ADEA may proceed under either a disparate impact or a disparate treatment theory of liability. "In order to establish a prima facie case of disparate impact, the plaintiff must (1) identify the specific employment practices or criteria being challenged; (2) show disparate impact; and (3) prove causation; 'that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.' " Rose v. Wells Fargo & Co., 902 F.2d 1417, 1424 (9th Cir.1990) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)). Whether a numerical disparity is sufficiently significant is judged on a case by case basis. Rose, 902 F.2d at 1424.
 
 
 13
 "Once the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant who may either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists." Id.[2] The employer may also offer business justifications for the alleged practice, such as job-relatedness or business necessity. Watson, 487 U.S. at 997-98. The plaintiff may respond by showing either that the employer's business justification is not legitimate, or that other selection devices would satisfy the employer's needs without a comparable discriminatory effect. Rose, 902 F.2d at 1424.
 
 
 14
 As an initial matter, we conclude that PGE's use of a subjective interview process is the specific employment practice being challenged by Flynn and Butler.[3] Flynn and Butler failed to establish a prima facie case that PGE's use of this practice had a discriminatory impact on older employees for two related reasons. First, the appellants used an inappropriate applicant pool for their statistical analysis. Flynn and Butler examined only the twenty-one applicants who had previously been CFS representatives in their attempt to show disparate impact. In explaining their decision to use only a subset of the applicant pool, Flynn and Butler claim that this subset is the most meaningful because applicants with prior CFS experience were the most likely to be hired as Sales Associates.[4]
 
 
 15
 Our case law is clear, however, that "[d]isparate impact should always be measured against the actual pool of applicants or eligible employees unless there is a characteristic of the challenged selection device that makes use of the actual pool of applicants or eligible employees inappropriate." Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 482 (9th Cir.1983); see also Sengupta v. Morrison-Knudsen Co., Inc., 804 F.2d 1072, 1076 (9th Cir.1986) (citing Moore with approval). As an example of a characteristic that would make use of the actual applicant pool inappropriate, the Moore court cited a discriminatory "entrance requirement" that would deter certain candidates from applying at all, such as a height or weight requirement or a requirement that a candidate have a high school diploma. In those cases, the court reasoned that "the pool of actual applicants does not fairly reflect the pool of individuals affected by the challenged requirement." Id. Moore accordingly does not support appellants' argument that the actual applicant pool for the Sales Associate positions is too broad to utilize in their statistical analysis, because Moore only carves out an exception for those cases in which the applicant pool is too narrow a measure.
 
 
 16
 Flynn and Butler also draw no support for their argument that only a subset of applicants should be considered in determining whether the hiring process was infected with age discrimination from their reliance on cases such as Mayor of City of Philadelphia v. Educational Equality League, 415 U.S. 605 (1974). In that case, the Supreme Court rejected plaintiffs' attempt to compare the racial composition of a school board nominating panel with the racial composition of the community at large, because the panel's charter specified that the members must be drawn only from certain community organizations. While it is true that "statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little value," Watson, 487 U.S. at 997, such is not the case here. PGE screened out the candidates that lacked minimal qualifications for the job by declining to interview the nine candidates with no sales experience. The appropriate applicant pool for statistical analysis is the 68 candidates who were interviewed, and not only the twenty-one former CFS representatives. If the 68 candidates are considered as the appropriate applicant pool, then the allegations of discriminatory impact from the interview process fade away: ten of the thirty-four successful applicants for sales positions were over age 40, a higher percentage than the number of applicants over age 40 in the initial applicant pool. Older candidates were apparently quite successful in the interview process.
 
 
 17
 Second, the size of the plaintiffs' statistical sample also undermines the significance of their statistical analysis, particularly because there was no need to employ such a small sample. It is true that, "[b]y necessity, courts sometimes must rely on statistics derived from small sample groups. Not to do so would deny employees in small companies some of the protections that [the ADEA] provides." Sengupta, 804 F.2d at 1076. However, as in Sengupta, PGE is not a small company, and "[t]here exists no necessity to employ a small group" in Flynn and Butler's statistical analysis because a sample group of at least 68 employees was readily available to them. Id.; see also Shutt v. Sandoz Crop Protection Corp., 944 F.2d 1431, 1434 (9th Cir.1991) (rejecting plaintiffs' sample group of 21 employees in part because there was no necessity to employ such a small group); Simpson v. Midland-Ross Corp., 823 F.2d 937, 943 & n. 7 (6th Cir.1987) (noting that statistics based on small statistical samples, such as a group of only 17 employees, are suspect). The usefulness of statistics "depends on all the surrounding facts and circumstances," International Bhd. of Teamsters v. United States, 431 U.S. 324, 340 (1977), and here appellants have utilized a statistical sample that excludes a large number of relevant employees and is unnecessarily small. We conclude that Flynn and Butler have not made out a prima facie case of disparate impact and affirm the grant of summary judgment.
 
 2. Disparate Treatment
 
 18
 A plaintiff may establish a prima facie case of disparate treatment by showing that he: 1) was a member of the protected class; 2) was performing his job in a satisfactory manner; 3) was discharged; and 4) was replaced by a substantially younger employee with equal or inferior qualifications. Rose, 902 F.2d at 1421. Where there is a general reduction in the work force--which was arguably the case at PGE[5]--the plaintiff need not show that he was replaced by a younger employee, but must instead show a continuing need for his skills and "show through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." Id. Once the plaintiff has established a prima facie case, the burden shifts to the employer to come forward with legitimate, nondiscriminatory reasons for its actions. Lowe v. City of Monrovia, 775 F.2d 998, 1007 (9th Cir.1985), amended, 784 F.2d 1407 (1986). If the employer meets its burden, the burden shifts back to the plaintiff "to raise a genuine factual question whether the proffered reason is pretextual." Id. at 1008; see also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981) (setting out the burdens of proof).
 
 
 19
 It is not disputed by the parties that Flynn and Butler were members of the protected class and were discharged. Furthermore, neither party seriously challenges the district court's conclusion that plaintiffs established at least a genuine issue of material fact as to two other elements of a prima facie case--satisfactory performance and a continuing need for comparable services. Accordingly, the key issue is whether Flynn and Butler cleared the additional--and critical--hurdle of producing sufficiently probative evidence that their discharge occurred under circumstances giving rise to an inference of intentional age discrimination.
 
 
 20
 Flynn and Butler contend that they have presented sufficient statistical, direct, and circumstantial evidence of discrimination to survive PGE's motion for summary judgment. As discussed above, however, the plaintiffs' statistical analysis is seriously flawed because they used both an inappropriate and unnecessarily small applicant pool. We conclude that the plaintiffs' statistical analysis is insufficient to support a claim of disparate treatment.
 
 
 21
 Flynn and Butler also contend that they have presented substantial direct evidence of discrimination. Their direct evidence is essentially a compilation of oral and written statements made by various PGE personnel. "Comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim." Merrick v. Farmers Insurance Group, 892 F.2d 1434, 1438 (9th Cir.1990). However, "stray" remarks, "when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue." Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir.1989). Although some of the comments made by PGE officials include the world "old," when read in context they do not support an inference of age discrimination.
 
 
 22
 For example, Flynn and Butler point to a 1982 report written by Kay Stepp, in which she expresses concern about the impact that an aging work force will have on employment trends. This report is not suggestive of an intent to discriminate, however, because it was written several years before PGE's reorganization, it was written by a PGE employee who did not participate in the selection process, and it merely contains very general observations about the demographics of an aging population. The bulk of the comments cited by Flynn and Butler are taken from the deposition of a former PGE employee, Ruthann Mogen, who repeated a number of statements allegedly made by Don Lengacher, the head of PGE's marketing and sales department. These comments also do not create an inference of discrimination sufficient to defeat summary judgment, because the bulk of the remarks are age-neutral and any allegedly discriminatory tenor to the remarks was attributed to them by Mogen. The remark by Steve Hawke, that PGE would "have to find employment for these young people," also falls short of the plaintiffs' summary judgment burden because it was made by a man who played no role in the selection process for Sales Associates. See Mauter v. The Hardy Corp., 825 F.2d 1554, 1558 (11th Cir.1987) (affirming summary judgment for employer despite vice-president's statement that the company was going "to weed out the old ones," in part because vice-president played no role in decision to terminate plaintiff).
 
 
 23
 In those cases that have found remarks by other employees to be probative of age discrimination, the evidence of specific discriminatory intent has been much more blatant. In Naton v. Bank of California, 649 F.2d 691, 698 (9th Cir.1981), for example, the plaintiff was advised by a company vice-president that he had very good grounds for an age discrimination suit, another employee was told that he was over the hill, and a member of the personnel department said that age discrimination was not important because "older people didn't have any organization for clout." In Samarzia v. Clark County, 859 F.2d 88, 91 (9th Cir.1988), amended, 866 F.2d 1185 (9th Cir.1989), the plaintiff had been referred to as senile by his supervisor and his supervisor had circled the words "retire now" in a memo sent to plaintiff that generally described retirement benefits. We find that Flynn and Butler have not presented sufficient direct evidence of discriminatory intent to survive PGE's motion for summary judgment.
 
 
 24
 Finally, appellants presented some circumstantial evidence of discrimination to the district court. First, Flynn and Butler argue that both the designation of the Sales Associate position as new and the hiring process were subjective in nature. See Jauregui v. City of Glendale, 852 F.2d 1128, 1136 (9th Cir.1988) (noting that subjective decisionmaking can strengthen an inference of discrimination). Although these processes may be subjective, that does not prove that they were discriminatory. Flynn and Butler have offered no evidence to suggest that these processes were designed and implemented with the intention to weed out older candidates, and the fact that ten of the thirty-four offers were made to candidates over age 40 implies that PGE did not in fact utilize the process to eliminate older employees.
 
 
 25
 Second, Flynn and Butler point to the fact they they had higher performance appraisals than most of the CFS applicants that were hired. As an initial matter, Flynn and Butler argue that PGE was required by its corporate management document to take performance appraisals into account. However, this management document was intended to apply in situations in which PGE was laying off some employees from an existing job and not when PGE was hiring people to fill a new job. Indeed, because most of the candidates for the sales position were not former CFS employees, the scores would have been of little use in making comparisons between candidates. Furthermore, the performance appraisal scores evaluated performance on many tasks which were simply not relevant to the new sales position, and were not designed to measure the characteristics like independence and competitiveness that PGE had deemed important to its new position.
 
 
 26
 Third, plaintiffs contend that testimony by various PGE employees was "inconsistent," but they point to no specific examples. Fourth, Flynn and Butler state that PGE took no steps to guard against age discrimination in the restructuring, but PGE did review the hiring criteria to ensure they were job related and ran a statistical analysis before the Sales Associate selections were announced to confirm that older employees had not been adversely affected.
 
 
 27
 Finally, Flynn and Butler argue that the facts that PGE had monetary incentives to reduce labor costs and that the terminated CFS representatives had higher average salaries than the retained representatives give rise to an inference of intentional discrimination. A desire to cut costs does not necessarily equate with an intent to discriminate on the basis of age, however, and in light of the appellants' complete failure to present any other evidence that raises an inference of intentional discrimination, this evidence does not rise to the level of "substantial factual evidence" or "significantly probative" evidence necessary to defeat a motion for summary judgment. Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983). We affirm the district court's grant of summary judgment on appellants' disparate treatment theory.
 
 3. Breach of Implied Contract
 
 28
 Flynn also challenges the district court's grant of summary judgment for PGE on his claim that PGE breached an implied contract of permanent employment by discharging him without good cause. He bases this claim on three conversations with PGE personnel, including two that occurred when he was contemplating leaving PGE for other employment. According to Flynn, he was told that with his work record, he had a job with PGE for as long as he wanted. He also reports that a prior edition of PGE's employee handbook contained a statement that "we hope the association will prove both permanent and rewarding."
 
 
 29
 We conclude that this evidence fails to raise a genuine issue of material fact as to the existence of a contract for permanent employment. Oregon adheres to "the recognized rule that generally, in the absence of a contract or statute to the contrary, an employer may discharge an employee at any time and for any cause." Yartzoff v. Democrat-Herald Publishing Co., 281 Or. 651, 576 P.2d 356, 359 (1978). Because of the "extraordinary and unusual nature of true lifetime contracts," courts typically require that " 'the intention to make an offer of life employment ... be clear and unequivocal. A casual remark made at a meeting, a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation inherent in such a contract.' " Mursch v. Van Dorn Co., 851 F.2d 990, 997 (7th Cir.1988) (quoting Brown v. Safeway Stores, Inc., 190 F.Supp. 295, 299-300 (E.D.N.Y.1960)). The remarks made to Flynn are no more than casual comments, offered in the context of praising his performance and encouraging him to remain with the company. These casual and unauthorized comments in no way suggest that PGE intended to offer Flynn an extraordinary lifetime contract. The grant of summary judgment was proper.
 
 CONCLUSION
 
 30
 The grant of summary judgment is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Butler and Flynn ranked 58th and 59th, respectively, and accordingly were not considered in the final stage of the screening process
 
 
 [2]
 The shifting burdens of proof used in Title VII cases are also applied to claims arising under the ADEA. Rose, 902 F.2d at 1420
 
 
 [3]
 Flynn and Butler allege that they also contended below that the determination that the Sales Associate position was new was a discriminatory practice under a disparate impact theory. However, the plaintiffs have pointed to no evidence that the designation of certain jobs as new had a discriminatory impact on individuals over 40, and the affidavit of their statistical expert that was offered to defeat summary judgment is directed only toward the results of the interview process
 
 
 [4]
 Flynn and Butler point out that 76% of the former CFS representatives were hired. PGE counters that only 21 of the 77 applicants for the Sales Associate positions had CFS experience and only 16 of the 34 offers were made to those employees. Therefore, they say, looking only at CFS applicants ignores most of the applicants who underwent the selection process
 
 
 [5]
 PGE does not expressly concede that this is a reduction in force case, but it also does not explicitly challenge Judge Frye's decision to treat it as such or her use of the summary judgment standard employed in a reduction in force case (which requires a plaintiff to establish an inference of intentional discrimination even before the defendant shows nondiscriminatory reasons for its actions)