Jack RITTER, Plaintiff–Appellant,

v.

HUGHES AIRCRAFT CO.,
Defendant–Appellee.

No. 93–56711.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 1995.

Decided June 22, 1995.

Michael J. Rodriquez and Douglas M. Marshall, Law Offices of Douglas M. Marshall, Newport Beach, CA, for plaintiff-appellant.

Wanda R. Dorgan, Hughes Aircraft Company, Los Angeles, CA, for defendant-appellee.

Before: NOONAN, O'SCANNLAIN, and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

Jack Ritter appeals from a grant of summary judgment in favor of Hughes Aircraft Co. Ritter claims that Hughes unlawfully discharged him: 1) because of his age, in violation of § 4 of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623,[1] and 2) in order to prevent his retirement benefits from vesting, in violation of § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.[2] We affirm.

---

1. Section 623 provides in relevant part:

    It shall be unlawful for an employer—

    (1) to fail or refuse to hire to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

    (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

2. Section 1140 provides in relevant part:

    It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

FACTS AND PRIOR PROCEEDINGS

Jack Ritter ("Ritter") was employed by Hughes Aircraft Co. ("Hughes") from July of 1962 until August of 1979, when he voluntarily quit to pursue work as a real estate agent. Ritter was rehired as a Senior Project Engineer in the Fall of 1981, and he subsequently held a variety of positions in the company. Sometime after 1984, Ritter was appointed a Staff Manager. Six months after his last transfer, his supervisor suffered a heart attack and was replaced by a new supervisor. Ritter then began to receive negative evaluations. In 1987 he was notified that unless he could find employment elsewhere in the company he would be laid off.

Ritter was able to find employment as a Senior Project Engineer reporting to a former colleague of his. In order to obtain this position, however, Ritter was forced to accept a job declassification, but not a decrease in salary. In this new position, Ritter was given responsibility for the Automatic TOW 2 Field Test Set Program ("AT2FTS"), a new product being developed by Hughes. Ritter was also assigned to work on the Ground TOW Program ("TFTS"), devoted to supplying spare parts and equipment updates for older units in the field. George Hall ("Hall") became Ritter's immediate supervisor, and, in 1989, Richard Kagimoto ("Kagimoto") became his Operations Manager. Kagimoto was responsible for making sure that the AT2FTS and TFTS programs were on schedule and within budget.

While Ritter worked in the AT2FTS and TFTS a variety of problems developed. Ritter acknowledges that Kagimoto viewed his (Ritter's) employment performance as deficient and the source of many of the problems. Ritter also acknowledges that Hall had notified him of specific areas of upper management dissatisfaction with his work. In May of 1990, Hall informed Ritter that upper management had decided that unless he (Ritter) could find another position at the company within six weeks he would be laid off.

Ritter appealed the six week deadline to the Human Resources Manager and was allowed to remain on payroll for over one year while seeking a permanent reassignment.

During this time Ritter occasionally found temporary assignments but most of his work was charged to an overhead account. In June of 1991, having been unable to find a permanent position, Ritter was laid off.

Approximately ten weeks after Ritter was laid off, Hughes revised its layoff policy. The new layoff policy provided that employees with at least 15 years of service and who were within 5 years of a retirement milestone would be offered alternate employment, in a downgrade/demotion position if necessary, prior to being laid off.

In February of 1992, Ritter brought this action against Hughes claiming that the company unlawfully terminated him because of his age and in order to prevent the vesting of his retirement benefits. In November of 1993, the district court granted summary judgment in favor of Hughes. The court held that Ritter had failed to present a *prima facie* claim under the ADEA, and that although Ritter had established a *prima facie* case of a violation of ERISA, he did not present adequate evidence that the reasons offered by Hughes to justify his layoff were mere pretexts. Ritter now appeals from the decision of the district court.

## ANALYSIS

### I. Summary Judgment on the ADEA Claim

Standards of proof in ADEA discrimination suits parallel those in Title VII suits. "We combine the Title VII and ADEA claims for analysis because the burdens of proof and persuasion are the same." *Wallis v. J.R. Simplot, Co.*, 26 F.3d 885, 888 (9th Cir.1994). The allocation of the burdens of proof and order of analysis follow a three step pattern:

[A] plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a

pretext for another motive which is discriminatory.

*Id.* at 889 (quoting *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 (9th Cir.1990)).

■ Ritter was 51 years old at the time of his termination, and he raised a material issue of fact as to whether he was qualified for the position of Senior Project Engineer and other positions he sought. In his Amended Complaint, Ritter alleged that after his discharge, work originally performed by him was taken by another Hughes' employee, Ernie Lau ("Lau"), "who was substantially younger ... and less qualified." But, in his opposition to summary judgment, Ritter argued not that Lau took his position, but that Lau had hired some *other* unnamed person outside the protected age group. Yet, in support of this claim, Ritter presented no specific evidence establishing the identity, age, or inferior qualifications of this employee. In view of the inconsistency of Ritter's claims and the vagueness of the evidence offered in support of them, we conclude, as did the district court, that Ritter failed to present sufficient evidence to raise any genuine material issue of fact as to whether he had been replaced by a person outside the protected class. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

■ Ritter, however, could also prove age discrimination "through circumstantial, statistical or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Wallis,* 26 F.3d at 891 (quoting *Rose,* 902 F.2d at 1421). Ritter contends that because he worked in a number of projects and positions which were eventually subject to cutbacks and layoffs, there exists an inference of "subterfuge" based on age discrimination.

We find Ritter's argument meritless. In *Nesbit v. Pepsico, Inc.,* 994 F.2d 703 (9th Cir.1993), an employee claimed that his employer had violated the California Fair Employment and Housing Act by discriminating against him because of his age. The plaintiff relied on the following evidence:

(1) statistical evidence that some older workers were terminated while some younger workers were retained and that employees hired after the RIF were generally younger than those terminated; (2) a comment by [the employee's] direct superior to [the employee] that '[w]e don't necessarily like grey hair'; and (3) an interview of [the employer's] Senior Vice President of Personnel in which he stated, "We don't want unpromotable fifty-year olds around."

*Id.* at 705. Observing that California courts have adopted the analysis applicable to ADEA claims, we concluded that "[v]iewing the evidence cumulatively, and in a light most favorable to the appellants, it falls short of creating an inference of age discrimination." *Id.* at 704–05. Ritter presented less evidence than that offered by the unsuccessful plaintiff in *Nesbit.* His employment history does not give rise to an inference of age discrimination.

We hold that the district did not err in concluding that Ritter failed to present a *prima facie* case of age discrimination and properly granted summary judgment.

### II. Summary Judgment on the ERISA Claim

■ We adopt the Second Circuit's view in *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2nd Cir.1988), that the burden shifting analysis applicable to Title VII and ADEA claims, described in section I above, applies also to § 510 ERISA claims:

Because the existence of a specific intent to interfere with an employee's benefit rights is critical in § 510 cases—yet is seldom the subject of direct proof—the district court allocated the burdens of production and order of proof in a manner similar to the approach used in Title VII and ADEA cases, where direct evidence of discriminatory intent is also scarce or nonexistent.

... We hold that the *McDonnell Douglas* presumptions and shifting burdens of production are equally appropriate in the context of discriminatory discharge cases brought under § 510 of ERISA.

*Dister,* 859 F.2d at 1111–12.

■ Section 510 of ERISA, 29 U.S.C. § 1140, prohibits an employer from terminat-

ing an employee in order to prevent the vesting of pension rights. Hughes challenged Ritter's assertion that the layoff policy was covered by ERISA. It argued that Ritter failed to establish that the layoff policy qualified as an "employee welfare benefit plan" or an "employee pension plan" covered by § 510 of ERISA. Hughes also points out that the layoff policy in question was revoked one year after it was instituted.

In *Dister*, the Second Circuit found that the termination of an employee four months prior to vesting of his pension rights, and the savings to his employer brought about by that termination, were sufficient to create an inference of discrimination. 859 F.2d at 1115. Ritter's claim, however, is much more attenuated. He argues that his ERISA rights were violated because he was prevented from taking advantage of the revised layoff policy adopted about ten weeks after he was laid off. Ritter, however, has failed to show how the layoff policy itself constitutes a plan covered by ERISA, or that there is any nexus between the revised layoff policy and the vesting of his retirement rights. If Ritter could have taken advantage of the layoff policy, which was terminated one year later, it is not evident that he would have obtained vesting of his retirement benefits. We disagree with the district court's finding that it was an undisputed fact that the revised layoff policy was covered by ERISA, and we conclude that Ritter has failed to raise a material issue of fact as to this element of his *prima facie* ERISA claim.

■ Ritter also failed to rebut the legitimate nondiscriminatory business reasons articulated by Hughes for Ritter's layoff. Hughes said that it laid Ritter off due to a reduction in workforce after carrying him in temporary positions for over a year after his discharge for cause from the AT2FTS and TFTS programs.

Both Kagimoto and Hall state that Ritter was laid off because of a variety of problems in their programs caused by Ritter's deficient performance. Ritter himself testified that he was aware at the time that upper management was disappointed with his performance, and that Kagimoto was not familiar with the programs and believed that Ritter could not perform his duties on time and within budget.

Hughes kept Ritter on the payroll for over a year while he attempted to find other permanent work. Hughes contends that Ritter was finally laid off due to a lack of work and a company wide reduction in workforce. Hughes offered the declaration of Marie Jaqua, Human Resources Manager, who stated that she made repeated efforts to find Ritter a permanent position after his discharge from AT2FTS and TFTS. Hughes relied on portions of Ritter's own deposition testimony acknowledging work shortages. Hughes also requested judicial notice of significant layoffs occurring at Hughes. We conclude that Hughes succeeded in articulating sufficient nondiscriminatory reasons for Ritter's layoff, and the burden of going forward then shifted back to Ritter to present evidence that the reasons advanced by Hughes were mere pretexts. *Washington v. Garrett*, 10 F.3d 1421, 1432–33 (9th Cir.1993).

Ritter contends in part that he is in fact not required to present evidence rebutting the reasons offered by Hughes. He argues that Hughes never successfully articulated legitimate nondiscriminatory reasons for his discharge and layoff. We reject this contention.

■ Ritter also argues that the district court improperly took judicial notice of widespread layoffs at Hughes based on a newspaper article and that general evidence of layoffs was not sufficient to explain Ritter's individual layoff. Fed.R.Evid. 201(b) provides that judicial notice must be "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." An appellate court reviews the district court's decision to take judicial notice under Rule 201 for an abuse of discretion. *United States v. Chapel*, 41 F.3d 1338, 1342 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2017, 131 L.Ed.2d 1015 (U.S.1995).

We conclude that judicial notice of layoffs at Hughes was not an abuse of discretion.

This is a fact which would be generally known in Southern California and which would be capable of sufficiently accurate and ready determination. Apart from the court's taking notice of the layoffs at Hughes, Ritter in his own depositions had indicated that the general shortage of jobs at Hughes had affected his ability to find work.

Finally, Ritter argues that Hughes' presentation of *two* reasons, namely, his prior dismissal for cause from his position under Kagimoto *and* his final layoff due to reduction in workforce, establishes sufficient proof of pretext to avoid summary judgment. Ritter relies on our holding in *Washington,* that in the "ordinary case, ... fundamentally different justifications [given by the employer] for an employer's action would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." 10 F.3d at 1434.

Ritter's reliance on *Washington* is inappropriate. The rationales offered by Hughes are not inconsistent. The distinct timing and justifications offered by Hughes for its separate decisions to dismiss Ritter from his position under Kagimoto and his lay off one year later distinguish this case from *Washington,* where an employer simultaneously offered two distinct and arguably inconsistent reasons for an employee's discharge.

Having considered Ritter's other contentions and finding them meritless, we hold that Ritter failed to raise any issue of material fact as to essential elements of his *prima facie* ADEA and ERISA claims, and also failed to rebut the nondiscriminatory reasons offered by Hughes for his discharge and layoff.

AFFIRMED.