Filed 10/21/22  Stock-Hendel v. Fox Digital Enterprises CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| THOMAS STOCK-HENDEL, | B309869 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV04334) |
| v. | |
| FOX DIGITAL ENTERPRISES, INC., | ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |
| Defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on October 4, 2022 is modified as follows:

1. On page 5, the paragraph that begins with "At that time, the finishing editors" is entirely deleted and replaced with the following paragraph:

At that time, the finishing editors working regularly at Fox— that that is, an average of at least four shifts per week—were Stock-Hendel, D.F., J.T., P.Wi., P.Wa., D.Y., and R.C.  These editors

ranged in age at that time from 51 to 66 years old.  Fox also employed "fill-in and/or more part-time finishing editors" as needed.  A fill-in editor provides coverage when other editors are sick, on vacation, or when coverage is otherwise needed, so such fill-in editors' shifts vary considerably depending on things like regular editor absences or whether it is premiere season.  In October 2017, these fill-in/part-time editors were T.R., D.W., and J.C.  These editors had an age range of 44 to 55 years at the time.  Stock-Hendel, at 66 years, was the oldest of all the finishing editors.

2.      On page 6, the paragraph that begins with "The October 2017 shift reductions" is entirely deleted and replaced with the following paragraph:

The October 2017 shift reductions were as follows:  P.Wa. (then 55 years) was reduced from five to four shifts per week; P.Wi. (then 63 years) was reduced from four to three shifts per week; J.T. (then 65 years) was reduced from five to four shifts a week; Stock-Hendel (then 66 years) was reduced from four to two shifts per week; and T.R. (then 54 years), who had typically been working one shift per week as a fill-in editor, stopped receiving any shifts.  The shift allocations for D.F. (then 59 years), D.Y. (then 54 years), and R.C. (then 50 years) did not change, and the shifts typically offered to D.W. (45 years)—who, as a fill-in editor, did not have regularly scheduled shifts—increased from typically one to two shifts per week to typically two shifts per week.

3.      On page 6, the two sentences that begins with "The cuts they decided to implement" and end with "fill-in shifts, which he declined." are entirely deleted and replaced with the following two sentences:

2

The cuts they decided to implement ultimately affected three editors, beginning in June 2018: J.T. (then 65 years), whose shifts were reduced from four to three per week, and Stock-Hendel (then 66 years) and P.Wi. (then 64 years), who both had their shifts reduced to zero. Stock-Hendel and P.Wi. remained on the roster. Later in 2018, Fox offered Stock-Hendel fill-in shifts, which he declined.

4.     On page 8, the sentence that begins with "Specifically, his declaration provided" is entirely deleted. That sentence is replaced with the following sentence:

Specifically, his declaration provided that he "was the oldest finishing editor[ ]," that of "the other two oldest finishing editors, namely [P.Wi.] and [J.T.], both of whom were in their middle 60's, one was also eliminated from the schedule, and one had his number of shifts reduced.

5.     At the top of page 10, the sentence that begins with "In addition, Fox offered" is entirely deleted and that sentence is replaced with the following sentence:

In addition, Fox offered D.Y.'s deposition testimony that "[t]he general complaint is that [Stock-Hendel] was argumentative [¶] . . . [¶] [a]nd that he asked questions before he thought things through."

6.     On page 11, the three sentences that begin with "Stock-Hendel also offered the declaration," and end with "easily grasped what was needed." are entirely deleted and replaced with the following three sentences:

Stock-Hendel also offered the declaration of Mark Bonn, a promo editor who worked at Fox from 1988 to 2016, indicating Stock-

3

Hendel was one of two editors (the other being P.Wi.) given the most complex or difficult projects. According to Bonn, Bonn requested Stock-Hendel handle his promos while working at Fox because Stock-Hendel required the least amount of direction and explanation and because, of all the finishing editors with whom Bonn worked, Stock-Hendel and P.Wi.'s work "was by far the best done and most error free." Also according to Bonn, P.Wi. and Stock-Hendel were always cooperative and easily grasped what was needed.

7.      At the bottom of page 12, the bullet-point sentence that begins with "The court sustained objections to the testimony" is entirely deleted and replaced with the following bullet-point sentence:

- The court sustained objections to the testimony of P.Wa. indicating that, in his experience, the questions he heard Stock-Hendel ask were routine.

8.      On page 13, the sentence that begins with "It is also noted that an editor" is entirely deleted and replaced with the following sentence:

It also noted that an editor continued to work at Fox after Stock-Hendel's termination who was not significantly younger than Stock-Hendel (specifically, J.T., who was 16 months younger).

9.      At the bottom of page 18 through the top of page 19, the sentence that begins with "Namely, Stock-Hendel argues" is entirely deleted and replaced with the following sentence:

Namely, Stock-Hendel argues that an inference of age discrimination arises from the circumstances of his firing, because Fox chose him, the oldest of the 10 finishing editors, as well as

another of the oldest finishing editors (P.Wi.), to lose *all* shifts in 2018.

10.     On page 20, the sentence beginning with "Returning to our summary judgment analysis" is entirely deleted (including fn. 2) and replaced with the following sentence and footnote:

Returning to our summary judgment analysis, we note that Stock-Hendel's status as the oldest finishing editor in the group of finishing editors at Fox in 2017 and 2018[1] (and the status of J.T. and P.Wi. as the second and third oldest, respectively) is evidentially insignificant, given the size of that group.

11.     On page 21, the sentence that begins with "Similarly, some of the finishing editors" is entirely deleted and replaced with the following sentence:

Similarly, some of the finishing editors who continued to be employed at Fox following the 2018 shift reductions were significantly younger than Stock-Hendel, but some—in particular J.T., who was 65 years at the time, only 16 months younger than Stock-Hendel—were not.

---

[1] Neither party questions that the same finishing editors who worked for Fox at the time of the shift reductions in 2017 also worked for Fox at the time of the 2018 shift reductions/eliminations.

12.   On pages 21–22, the text of footnote 3 is deleted and replaced with the following text:

The average age of the finishing editors terminated in 2018 (Stock-Hendel and P.Wi.) was 65 years. The editors retained in 2018 were D.F., J.T., P.Wa., D.Y., R.C., T.R., D.W., and J.C. The average age of that group was 53.875 years.

These modifications do not constitute a change in the judgment.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

Filed 10/4/22  Stock-Hendel v. Fox Digital Enterprises CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THOMAS STOCK-HENDEL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>FOX DIGITAL ENTERPRISES, INC.,<br><br>Defendant and Respondent. | B309869<br><br>(Los Angeles County<br>Super. Ct. No. 19STCV04334) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

Law Offices of Jeffrey C. McIntyre, Jeffrey Curran McIntyre and Robert Garcia, Jr., for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp, Seth E. Pierce and Bradley J. Mullins for Defendant and Respondent.

———————————

Thomas Stock-Hendel appeals from a judgment dismissing his age discrimination lawsuit against his former employer, Fox Digital Enterprises, Inc. (Fox).  Stock-Hendel contends the trial court erred in granting summary adjudication for Fox on two key issues:  (1) whether Stock-Hendel could make a prima facie case, and (2) whether the nondiscriminatory reason Fox identified for reducing and ultimately eliminating Stock-Hendel's shifts was pretextual.  Stock-Hendel further challenges certain evidentiary rulings the court made in connection with Fox's summary judgment/adjudication motion.

We affirm.  The trial court correctly concluded that Fox identified evidence establishing Stock-Hendel could not prove circumstances supporting an inference of discriminatory intent, a requisite element of a prima facie case for age discrimination.  We further hold that the trial court did not abuse its discretion in permitting Fox to rely on certain evidence it identified for the first time at the reply stage of Fox's summary judgment/adjudication motion.  Finally, as to the remainder of Stock-Hendel's challenges to the court's evidentiary rulings, even assuming, for the sake of argument, that these rulings were in error, such error would not affect our analysis and ultimate conclusion on appeal.

## FACTS AND PROCEEDINGS  BELOW

The following background is based on the evidence the parties presented at the summary judgment stage.  Unless the source of the information is indicated, it is undisputed.

### A.    *Stock-Hendel's Duties as a Finishing Editor at Fox*

In November 1989, Fox hired Stock-Hendel as a finishing editor.  A finishing editor electronically finishes advertising

"promos" for Fox television programs. Room producers assign work to the finishing editors, provide specific instructions regarding needed edits, and approve the final promos.

At Fox, finishing editors are assigned to an editor's bay, which is a separate office filled with required electronic equipment. Room producers typically spend their shift in an editor's bay. The editor's bay, in effect, acts as the room producer's office and the editor's office, and the room producers directly assist, review the work of, and answer the questions of the editors with whom they share an office. As there were fewer room producers than editors, some finishing editors, including Stock-Hendel, generally worked without a room producer in their editing bay.

All finishing editors asked questions of room producers. Because a room producer was not typically in his editing bay, when Stock-Hendel needed to obtain information to complete a promo, he called a room producer or went to an editing bay that a room producer shared with another finishing editor.

## B. Finishing Editor Shift Reductions and Stock-Hendel's Termination

### 1. Finishing editor staffing generally

Under the agreement entered into between Fox and the union representing finishing editors, finishing editors like Stock-Hendel are what is referred to as daily hires. This means that, technically, a finishing editor is rehired each day of work. Given that promo work, by its nature, varies over the course of the television season, the daily hire approach was implemented to permit management to staff up or down as work needs change. The union specifically negotiated a premium wage to compensate for this lack of job security.

Stock-Hendel was a daily hire while working at Fox, although, in practice, he was continuously on Fox's work schedule (except for vacations) from November 1989 until July 2018.

At the time Stock-Hendel was terminated, Christy Cofer (the vice president of on-air marketing operations) and Tina Manos (the director of on-air marketing operations) determined the required number of finishing editor shifts and who would work them. The scheduling department, ultimately under William Morales (vice president of entertainment post-production engineering) then implemented Cofer and Manos's scheduling choices.

### 2. *2009 finishing editor shift reduction*

In 2009, Fox reduced the number of finishing editor shifts as part of overall cost reductions. Stock-Hendel's regular shifts were reduced from a consistent schedule of five shifts per week to four shifts per week. After this reduction, however, Fox offered him additional shifts "relatively regularly," depending on additional staffing needs. The 2009 reduction did not impact all finishing editors. Stock-Hendel was told that he was selected, in part, due to his tendency to "usurp[ ] [the room producer's] authority," an issue that, according to Stock-Hendel, resulted from the changing role of the room producers at the time, and that he corrected after it was raised with him in 2009. Stock-Hendel did not view these shift reductions as discriminatory, and instead testified at deposition that "they [Fox] gave me an honest answer [when he asked why he was selected] and I accepted it."

### 3. *2017 and 2018 finishing editor shift reductions*

In 2017, Fox decided it needed to make cuts across various units to reduce costs. Scott Edwards (executive vice president of creative advertising) announced this to the finishing editors at an

4

all-editors meeting that Stock-Hendel attended in October 2017. Edwards conveyed to the editors that, in Stock-Hendel's words, "[t]he nature of the workload was going to be changing. That philosophically, people should view what they were doing at Fox as a strict freelance job, even though the majority of people in that room had been there for a very long time, such as myself. That . . . because they were expecting to cut fewer promos, there would be less work. That the nature of what they were doing would be to try and do as much promotion as they could, but with less. [¶] . . . [T]he rule—the word came down he had to absolutely stay within budget even though they had gone over budget every year. . . . [T]he whip was coming down."

Contemporaneous Fox email communications identify these budget cuts, as well as finishing editor "[n]ight shifts experiencing early releases," as the basis for the 2017 reduction in the total number of finishing editor shifts to be staffed. Cofer and Manos chose to reduce the total number of shifts from 35 to 29 shifts per week.

At that time, the finishing editors working regularly at Fox— that that is, an average of at least four shifts per week—were Stock-Hendel, Daryl Frederick, Jack Thannum, Patrick Williams, Paul Ware, David Yount, and Ruth Cooper. These editors ranged in age at that time from 51 to 66 years old. Fox also employed "fill-in and/or more part-time finishing editors" as needed. A fill-in editor provides coverage when other editors are sick, on vacation, or when coverage is otherwise needed, so such fill-in editors' shifts vary considerably depending on things like regular editor absences or whether it is premiere season. In October 2017, these fill-in/part-time editors were Thomas Reichlin, Dylan Way, and Jason Cheung. These editors had an age range of 44 to

55 years at the time.  Stock-Hendel, at 66 years, was the oldest of all the finishing editors.

The October 2017 shift reductions were as follows:  Ware (then 55 years) was reduced from five to four shifts per week; Williams (then 63 years) was reduced from four to three shifts per week; Thannum (then 65 years) was reduced from five to four shifts a week; Stock-Hendel (then 66 years) was reduced from four to two shifts per week; and Reichlin (then 54 years), who had typically been working one shift per week as a fill-in editor, stopped receiving any shifts.  The shift allocations for Frederick (then 59 years), Yount (then 54 years), and Cooper (then 50 years) did not change, and the shifts typically offered to Way (45 years)—who, as a fill-in editor, did not have regularly scheduled shifts—increased from typically one to two shifts per week to typically two shifts per week.

In 2018, due to "a reduction of workload during the summer in addition to being asked to reduce costs," Fox announced it would again reduce the number of finishing editor shifts.  Cofer and Manos again decided which finishing editors' shifts to reduce or eliminate.  In connection with this, Manos consulted with Steve DiPietro, the lead room producer at the time.  The cuts they decided to implement ultimately affected three editors, beginning in June 2018:  Thannum (then 65 years), whose shifts were reduced from four to three per week, and Stock-Hendel (then 66 years) and Williams (then 64 years), who both had their shifts reduced to zero.  Stock-Hendel and Williams remained on the roster.  Later in 2018, Fox offered Stock-Hendel fill-in shifts, which he declined.

Although Fox still adds occasional ad hoc shifts (similar to the ones previously offered to Stock-Hendel) to the schedule to meet one-off needs, Fox has never restored Stock-Hendel's regularly

scheduled shifts. Indeed, the total number of finishing shifts scheduled by Fox has dropped significantly since 2016.

### C. *Stock-Hendel's Lawsuit Against Fox*

Stock-Hendel filed suit against Fox, alleging two causes of action: age discrimination under California's Fair Employment and Housing Act (FEHA) and wrongful termination in violation of public policy. Both were based on allegations that, in 2017, Fox "began severely reducing the number of hours [Stock-Hendel] was assigned to work, all while assigning more hours to younger employees in the same job category" and that, after Fox terminated Stock-Hendel in 2018, it "increased the number of work hours for younger employees with less experience than [Stock-Hendel], hours and projects that could have also been assigned to [Stock-Hendel]."

### D. *Fox's Motion for Summary Judgment or Adjudication*

Fox moved for summary judgment or, in the alternative, summary adjudication. Both parties raised objections to evidence offered by the other in connection with the motion. Stock-Hendel objected to Fox offering a compendium of evidence for the first time on reply. Stock-Hendel did not, however, request a continuance or permission to file a surreply in the six months between Fox filing its reply compendium and the motion hearing, during which time discovery was ongoing. We discuss Fox's objections in more detail in Discussion part B, *post*.

Fox's motion argued for summary judgment or adjudication on the basis that, inter alia, Stock-Hendel could not establish a prima facie case of age discrimination, because he had not and could not offer evidence supporting a reasonable inference that Fox acted with a discriminatory motive. Fox argued that membership in a protected class is not enough, and submitted evidence reflecting

that Stock-Hendel had never heard any age-based comments or jokes during his long tenure at Fox. Fox also pointed to evidence that Fox had "regularly scheduled (hired) [Stock-Hendel]" for many years "while he was in his [60's]," which, given that Stock-Hendel was a daily hire, Fox argued supported an inference that there was no discriminatory motive for his firing. (See *Bradley v. Harcourt, Brace & Co.* (9th Cir. 1996) 104 F.3d 267 ["where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive].) Fox further pointed to evidence that Fox offered extra shifts after both the 2017 and 2018 shift reductions, that shifts had been in a general decline, that an editing bay had been closed, and that shifts from which Stock-Hendel was removed had not been restored.

In opposition to Fox's motion, Stock-Hendel argued that the ages of the finishing editors most and least affected by the shift reductions/eliminations sufficiently supported an inference of discriminatory intent to state a prima facie case. To support his argument, Stock-Hendel offered his own declaration roughly estimating the ages of the various finishing editors working at Fox in 2017 and 2018. Specifically, his declaration provided that he "was the oldest finishing editor[ ]," that of "the other two oldest finishing editors, namely Patrick Williams and Jack Thannum, both of whom were in their middle 60's, one was also eliminated from the schedule, and one had his number of shifts reduced. All of the remaining finishing editors, as of July 2018, were five to 20 years or more younger than [Stock-Hendel]. [He] had worked with all of the other editors for many years and some [he] [knew] their exact ages and [he] [knew] the approximate ages of others."

To rebut this argument, Fox included the Morales declaration in its reply compendium. The declaration identifies the specific

ages of the relevant finishing editors, as well as whether they were regularly scheduled or fill-in editors. These birthdates reflect ages of the various finishing editors that are generally consistent with the estimated ages included in Stock-Hendel's declaration. Fox argued that the specific ages of the finishing editors, when considered alongside how the shift reductions and eliminations affected each editor, actually precluded an inference of discriminatory intent, even at the prima facie stage.

Fox's motion sought summary judgment or adjudication on the additional basis that, even assuming Stock-Hendel had met his burden of establishing a prima facie case for age discrimination, Fox had presented evidence establishing legitimate, nondiscriminatory reasons for the shift reductions affecting Stock-Hendel—namely, the need for cost reductions and problems with Stock-Hendel's work. Fox further argued Stock-Hendel had failed to provide evidence sufficiently supporting Fox's proffered reasons were pretextual. To support these arguments, Fox submitted declarations and documentary evidence reflecting that cost reductions motivated the reduction/elimination of finishing editor shifts in 2017 and 2018. Both Fox and Stock-Hendel also offered declarations and deposition testimony of Fox employees and officers, and of Stock-Hendel himself, regarding Stock-Hendel's work performance.

### 1. *Fox's evidence regarding Stock-Hendel's work performance*

Fox offered evidence that Cofer, Manos and DiPietro viewed Stock-Hendel as a weaker performer than his peers, specifically that, compared to other finishing editors, he struggled to work independently, asked too many questions, was often argumentative, and was therefore less efficient and produced less work than his peers. Fox also offered deposition testimony of Stock-Hendel and

two other finishing editors recalling complaints or comments about the number of questions Stock-Hendel asked. In addition, Fox offered Yount's deposition testimony that "[t]he general complaint is that [Stock-Hendel] was argumentative [¶] . . . [¶] [a]nd that he asked questions before he thought things through."

According to lead room producer DiPietro, Stock-Hendel's need for " 'hand holding' " meant DiPietro had to give him only straightforward work. DiPietro was able to roughly quantify that he "would spend minimum twice as much with [Stock-Hendel] than I would with the other editors." Cofer and Manos declared that, because of these issues, they targeted Stock-Hendel's shifts when cost cuts mandated shift reductions in 2017 and 2018.

### 2. *Stock-Hendel's evidence regarding his work performance*

In opposing summary judgment, Stock-Hendel offered evidence that he had never received any written communication from anyone at Fox reflecting the concerns about his work performance identified in Fox's motion. Fox does not provide finishing editors with regular performance reviews. It was, however, the practice at Fox for the vice president over the editors' group, Morales, to intervene when an editor was having chronic problems. Neither Morales nor anyone from the Fox human resources department ever notified Stock-Hendel that he had any chronic problems or that Morales needed to speak to Stock-Hendel. Stock-Hendel also submitted evidence that he was paid 40 percent more per hour than union scale and $10.00 more than the average hourly rate of his colleagues.

Stock-Hendel offered evidence that he had worked with 20 to 30 room producers during his time at Fox, and that DiPietro was the only one who had ever told him he asked too many questions. Stock-Hendel did acknowledge at deposition

10

that DiPietro had made DiPietro's concerns about Stock-Hendel's questions known to Stock-Hendel, and that Stock-Hendel was aware that "DiPietro would get frustrated because I would ask him questions." Stock-Hendel offered additional deposition testimony in which DiPietro described his complaints to colleagues about Stock-Hendel's work as "venting" and was unable to estimate how much time he spent answering Stock-Hendel's questions, or to provide an estimated number of average daily questions.

Stock-Hendel also offered declarations and deposition testimony of himself and others attesting to his abilities as a finishing editor while at Fox. Stock-Hendel testified that he only asked the room producer for information which was either not available to him at all, or which, if he had attempted to find the information himself, it would have greatly slowed the process. The questions generally only took a couple of minutes or less. Stock-Hendel also offered a declaration of Camella Coggins, a room producer who worked at Fox from 2000 to early 2016. According to Coggins, Stock-Hendel did not ask unnecessary questions, and she spoke highly of his work. Stock-Hendel also offered the declaration of Mark Bonn, a promo editor who worked at Fox from 1988 to 2016, indicating Stock-Hendel was one of two editors (the other being Williams) given the most complex or difficult projects. According to Bonn, Bonn requested Stock-Hendel handle his promos while working at Fox because Stock-Hendel required the least amount of direction and explanation and because, of all the finishing editors with whom Bonn worked, Stock-Hendel and Williams's work "was by far the best done and most error free." Also according to Bonn, Williams and Stock-Hendel were always cooperative and easily grasped what was needed.

11

### 3. *The court's evidentiary rulings on summary judgment*

In its tentative ruling on Fox's motion, the court addressed most of the parties' evidentiary objections. On appeal, Stock-Hendel challenges several evidentiary rulings sustaining objections by Fox. These rulings are as follows:

- The court sustained Fox's objections to portions of Stock-Hendel's declaration indicating he asked only routine questions seeking necessary information, and that these questions were of the type that room producers were employed to answer to assist the editing process. Fox objected to this evidence as irrelevant, lacking foundation and speculative.

- The court sustained Fox's objections to portions of Stock-Hendel's declaration indicating he was told by various people that he was one of the faster editors. Fox objected on the basis that these portions of the declaration were irrelevant, lacked foundation, speculative, hearsay, and conclusory.

- The court sustained Fox's objections to portions of the Coggins declaration regarding her views on Stock-Hendel's work performance and work demeanor. Fox objected to these portions as irrelevant and conclusory subjective opinions, "as Coggins had no role in the decisions at issue," and based on Coggins having last worked with Stock-Hendel in approximately 2007.

- The court sustained objections to the testimony of Ware indicating that, in his experience, the questions he heard Stock-Hendel ask were routine.

12

The court did not expressly rule on Stock-Hendel's objection to Fox's submission of a reply compendium, and thereby presumptively overruled it. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.)

### 4. *The court's ruling on Fox's summary judgment and adjudication motion*

Following a hearing, the court granted Fox's motion for summary adjudication as to three issues.[2] First, the court concluded Stock-Hendel "[could not] establish a prima facie case for age discrimination." In so concluding, the court noted that "[i]n reply, defendant Fox . . . provides evidence that all finishing editors—those whose shifts were eliminated and those who continued to work as finishing editors—were members of the protected class." It also noted that an editor continued to work at Fox after Stock-Hendel's termination who was not significantly younger than Stock-Hendel (specifically, Thannum, who was 16 months younger).

Second, the court concluded Stock-Hendel had failed to meet his burden of demonstrating a triable issue of fact as to whether Fox's proffered reasons for eliminating his shifts were merely a pretext for age discrimination.

Third, the trial court granted summary adjudication in Fox's favor on punitive damages, based on the court's rulings regarding the prima facie case and nonpretextual motive.

---

[2] The court also denied as moot the portions of Fox's motion concerning two other named Fox entities, and denied summary adjudication on the issue of the timeliness of Stock-Hendel's Department of Fair Employment and Housing complaint regarding the 2017 reduction of plaintiff's shifts. Neither party challenges these rulings on appeal.

13

Judgment for Fox was entered, and Stock-Hendel timely appealed.

## DISCUSSION

Stock-Hendel has limited the issues on this appeal to (1) the prima facie finding; (2) the pretext finding; and (3) certain evidentiary rulings. We conclude that the court did not err in finding that Fox had met its burden to show that Stock-Hendel could not establish a prima facie case. Because that finding is dispositive, we need not consider whether the court erred in its finding on pretext. As to Stock-Hendel's evidentiary arguments, we conclude the court correctly overruled Stock-Hendel's objection to the portion of Fox's reply compendium on which we rely in our decision. We need not reach the remainder of the evidentiary arguments Stock-Hendel raises, because even considering the evidence Stock-Hendel claims was improperly excluded, we would still affirm the court's judgment.

### A.    *General Legal Principles Regarding Age Discrimination Claims and Summary Judgment*

Both federal and state law prohibit employers from discriminating against employees on the basis of age. (Gov. Code, §§ 12940, subd. (a) & 12941; 42 U.S.C. § 2000e et seq.; 29 U.S.C. § 621 et seq.) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

An employee alleging age discrimination under state or federal law must be over 40 years old and must "ultimately prove that [an] adverse employment action taken was based on his or her age." (*Hersant v. Department of Social Services* (1997) 57

14

Cal.App.4th 997, 1002 (*Hersant*); accord, *Guz, supra*, 24 Cal.4th at pp. 354−355.) "Since direct evidence of such motivation is seldom available, the courts use a system of shifting burdens as an aid to the presentation and resolution of age discrimination cases." (*Hersant, supra*, at p. 1002.) Specifically, "California has adopted the three-stage . . . [¶] . . . *McDonnell Douglas* [*Corp. v. Green* (1973) 411 U.S. 792 . . .] test," which "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. . . . [B]y successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra*, at p. 354.)

At trial, this "burden-shifting system requires the employee first establish a prima facie case of age discrimination. If the employee does so, the employer is required to offer a legitimate non-age-based reason for the adverse employment action. If it does not, then the employee prevails. [Citations.] [¶] Given the varying nature of the problem, it is impossible to make an exact, all-inclusive statement of the elements of a prima facie age discrimination case applicable in all situations. [Citations.] The general requirement is that the employee offer circumstantial evidence such that a reasonable inference of age discrimination arises. The requirement is not an onerous one. [Citations.] [¶] . . . [¶] When the employee has made this showing, the burden shifts to the employer to go forward with evidence that the adverse action was based on considerations other than age discrimination. When the employer offers evidence justifying the adverse action on a basis other than age, the burden shifts back to the employee to meet his ultimate obligation of proving that the reason for the adverse action was age discrimination. This ultimate issue is

15

decided on all the evidence. [Citations.]" (*Hersant, supra,* 57 Cal.App.4th at pp. 1002–1003.)

"The *McDonnell Douglas* framework is modified in the summary judgment context." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.) On a summary judgment motion "[i]n an employment discrimination case, . . . [t]he 'employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Zamora v. Security Industrial Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32; see Code Civ. Proc., § 437c, subds. (c) & (p)(2).)

Whether Fox has met this burden as the defendant in an age discrimination case presents a question of law for the court, which we review de novo. (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201.) In so doing, we view the evidence in the light most favorable to Stock-Hendel as the party opposing the motion. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.)

### B.    *Fox Presented Evidence Fatal to Stock-Hendel's Prima Facie Case*

In *O'Connor v. Consolidated Coin Caterers Corp.* (1996) 517 U.S. 308, the United States Supreme Court made clear that being replaced by someone who is under 40 years old is *not* an element of a prima facie age discrimination case, even though an age discrimination plaintiff must himself be over 40 years. Specifically, the Court noted that the Age Discrimination in Employment Act (ADEA), like the FEHA, "does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older.

16

The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*." (*Id.* at p. 312, italics omitted.) In this context, the Court noted that "[a] prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion' " (*id.* at p. 312, italics omitted), and that "[i]n the age-discrimination context, such an inference *cannot be drawn from the replacement of one worker with another worker insignificantly younger*." (*Id.* at p. 313, italics added.)

Relying on this reasoning, several courts—including our state Supreme Court—have identified replacement by, or more favorable treatment for, a "significantly younger" person as an element of a prima facie age discrimination case, at least in the absence of direct evidence of discriminatory intent. (See, e.g., *Guz, supra*, 24 Cal.4th at p. 366 [noting that there is "no basis to suspect a motive of prohibited bias" when "an age-protected worker is directly replaced by a person not significantly younger"]; *ibid.* ["[i]n the context of a work force reduction . . . [an age discrimination plaintiff] need only show, prima facie, that persons significantly younger, but otherwise similarly situated, were ' "treated more favorably" ' "]; *Grosjean v. First Energy Corp.* (6th Cir. 2003) 349 F.3d 332, 335 ["[i]n age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person"].) Moreover, "[a] majority of [federal] circuit courts . . . have held that an age difference of less than [10] years, without more evidence, is insufficient to make a prima facie case of age discrimination." (*France v. Johnson* (9th Cir. 2015) 795 F.3d 1170, 1174 (*France*).)

Stock-Hendel points out that " 'failure to prove replacement by a younger employee is "not necessarily fatal" to an age discrimination claim where the discharge results from a general reduction in the work force due to business conditions,' " and that courts have treated this requirement with "flexibility." (See, e.g., *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 917 [FEHA case].) But these courts have recognized such flexibility on the basis that replacement by a significantly younger worker is only one possible basis on which a court could infer "that the [challenged employment action] occurred under circumstances giving rise to an inference of age discrimination," which is the ultimate requirement of a prima facie age discrimination case. (*Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1421; see *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1755 ["[t]he purpose of the prima facie case is for the plaintiff to produce evidence demonstrating that the employment decision occurred in 'circumstances which allow the court to infer unlawful discrimination' "].) Thus, whether or not replacement by a significantly younger employee is a formal element of an age discrimination claim, the law is clear that a plaintiff cannot establish discriminatory intent at the prima facie stage solely by showing the employer replaced the plaintiff with an individual not significantly younger than the plaintiff or by showing the employer's disparate treatment of plaintiff and an individual not significantly younger than the plaintiff.

This line of cases is highly relevant to the instant appeal, because the theory underlying Stock-Hendel's prima facie case relies entirely on other finishing editors' ages relative to his own, and how each editor's shift changes in 2017 and 2018 line up with those age differences. Namely, Stock-Hendel argues that an inference of age discrimination arises from the circumstances

of his firing, because Fox chose him, the oldest of the 10 finishing editors, as well as another of the oldest finishing editors (Williams), to lose *all* shifts in 2018. He further argues that in 2017, Fox reduced the shifts of the oldest finishing editors more than it reduced the shifts of the other finishing editors. To support this aspect of his prima facie case, Stock-Hendel relies on his declared estimates regarding the ages and relative ages of the relevant finishing editors as a group, which he acknowledged at the hearing before this court are generally consistent with—although far less specific than—the specific ages of each relevant editor contained in the Morales declaration.

At this point in our summary judgment analysis, we must pause to address Stock-Hendel's challenge to the court's implicit overruling of his objection to the reply compendium, at least to the extent that the compendium contains the Morales declaration.

We conclude the court did not abuse its discretion in implicitly overruling this objection to the extent doing so allowed Fox to offer the Morales declaration for the first time on reply. In Fox's original motion, the basis on which Fox sought to establish Stock-Hendel could not make a prima facie showing of discriminatory intent was *not* the relative ages of the other finishing editors, but Stock-Hendel's testimony that he had never heard any discriminatory comments regarding age, and that Fox had repeatedly hired him for years while he was in his 60's. In opposing the motion, Stock-Hendel did not dispute any of this evidence. Rather, he argued that the relative ages of the finishing editors and how the shift reductions/eliminations affected them, not any discriminatory comments, provided the "something more" on which Stock-Hendel's prima facie case relied to support an inference of discriminatory intent. To rebut this, Fox submitted the Morales declaration, which contained more precise information about the

19

ages and jobs of the finishing editors. Although Fox had the burden in its initial motion, it had the burden of proving a negative—that Stock-Hendel could not establish discriminatory intent in any way, on any basis. Denying Fox the ability to offer evidence on reply that Stock-Hendel had not established discriminatory intent in a way Stock-Hendel raised for the first time in its opposition would be to require Fox to anticipate and counter every possible way Stock-Hendel might attempt to make his prima facie case. The court acted within its discretion in declining to require this and instead considering the Morales declaration as proper rebuttal evidence over Stock-Hendel's objection. We consider it in our analysis as well.

Returning to our summary judgment analysis, we note that Stock-Hendel's status as the oldest finishing editor in the group of finishing editors at Fox in 2017 and 2018[3] (and the status of Thannum and Williams as the second and third oldest, respectively) is evidentially insignificant, given the size of that group. That group was comprised of at most 10 people—seven regularly scheduled editors, and three "fill-in" editors. "[W]here alleged numerical favoritism of younger workers arose within an extremely small employee pool, courts have rejected any consequent inference of intentional bias on grounds, among others, that the sample was too minuscule to demonstrate a statistically reliable discriminatory pattern." (*Guz, supra*, 24 Cal.4th at p. 367; see *Rose, supra,* 902 F.2d at p. 1423 [where a plaintiff chooses to rely solely on statistical evidence to carry his prima facie burden, " '[he] must show a stark pattern of discrimination unexplainable on grounds other than age' "]; *Diaz v. Eagle Produce Ltd. Partnership* (9th Cir. 2008) 521

---

[3] Neither party questions that the same finishing editors who worked for Fox at the time of the shift reductions in 2017 also worked for Fox at the time of the 2018 shift reductions/eliminations.

F.3d 1201, 1209 (*Diaz*) [16-employee pool disregarded as insufficient to support inference of discrimination]; *Sengupta v. Morrison-Knudsen Co.* (9th Cir. 1986) 804 F.2d 1072, 1076 [disregarding evidence that, in a 28-employee pool, four of five African-Americans were laid off, as insufficient to establish prima facie age discrimination because " ' "statistical evidence derived from an extremely small universe" . . . "has little predictive value and must be disregarded" ' "].)

But even setting aside the size of the finishing editor pool, the evidence Fox presented on summary judgment prevents us from inferring discriminatory intent from Fox's treatment of Stock-Hendel as compared to its treatment of other finishing editors in that pool. Namely, the evidence of the specific ages and shift reductions of finishing editors reflects that *some* of the editors who lost fewer shifts than did Stock-Hendel in 2017, were "significantly" younger than Stock-Hendel—but some were not. Similarly, some of the finishing editors who continued to be employed at Fox following the 2018 shift reductions were significantly younger than Stock-Hendel, but some—in particular Thannum, who was 65 years at the time, only 16 months younger than Stock-Hendel—were not. (See *cf. France, supra*, 795 F.3d at p. 1174 [eight-year average age difference between plaintiff and younger employees favored for promotion would have been insufficient even to support prima facie case under ADEA, had age difference not been bolstered by other evidence].)

Our conclusion is bolstered by the fact that the difference between the *average* age of finishing editors retained in 2018 and the average age of those terminated—11.125 years[4]—is just barely

---

[4] The average age of the finishing editors terminated in 2018 (Stock-Hendel and Williams) was 65 years. The editors retained

at the threshold amount of time courts begin to consider potentially significant (at least where, as here, there is no other evidence supporting intent).  (See *France, supra,* 795 F.3d at p. 1174 [adopting presumption that less than 10-year difference presumptively insignificant]; *Diaz, supra,* 521 F.3d at p. 1209 ["[t]hat the average age of the workers hired during the two-year period is approximately nine and a half years younger than the average age of those laid off—38.75 versus 48.4 years—also fails to justify an inference of age discrimination"].)  "The disparity is not so stark as to suggest bias rather than pure chance."  (*Ibid.*)  This comparison becomes even less impressive when one segregates and compares the treatment of only those truly "similarly situated" to Stock-Hendel—namely, regularly scheduled finishing editors, rather than both regularly scheduled and fill-in editors.  The average age of regularly scheduled editors retained in 2018 was 56.2 years, whereas the average age of those terminated in 2018 is 65 years, reflecting a presumptively insignificant difference of 8.8 years.

Under California Supreme Court precedent, mere age comparisons between Stock-Hendel and the handful of other finishing editors Fox retained in 2018 and/or whose shifts Fox reduced to a lesser degree than it did Stock-Hendel's in 2017, cannot alone support a reasonable inference of age discrimination.  (See *Guz, supra*, 24 Cal.4th at p. 369 [employer's alleged disparate treatment of plaintiff and two younger workers, one eight years younger and the other six years younger, did not support reasonable inference of age discrimination, in absence of independent

---

in 2018 were Frederick, Thannum, Ware, Yount, Cooper, Reichlin, Way, and Cheung.  The average age of that group was 53.875 years.

indication decision maker considered their age differences significant].)

Nor has Stock-Hendel identified any other evidence suggesting discriminatory intent. In arguing to the contrary, Stock-Hendel points to certain evidence that is also relevant to the issue of pretext. Specifically, he argues that evidence regarding his capabilities as an editor and Fox's failure to formally censure him regarding his performance, when combined with what Stock-Hendel characterizes as weak evidence that Stock-Hendel was less capable than other finishing editors, render Fox's claim that its employment decisions were based on Stock-Hendel's work performance implausible, and that *this implausibility* supports an inference of discriminatory intent at the prima facie stage.

We conclude that, as a matter of law, the evidence does not support an inference of discriminatory intent in this way. A reasonable trier of fact could not find based thereon that it was *implausible* Fox chose to eliminate Stock-Hendel's shifts as part of cost-cutting measures because of his capabilities relative to those of the other finishing editors. (See *Hersant, supra*, 57 Cal.App.4th at p. 1005 [employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" ' "].) First, evidence that Stock-Hendel's previous supervisors did not take issue with his work in and before 2016 does not support a reasonable inference that, in 2017 and 2018, it was implausible for the lead room producer (DiPietro) to take issue with it. Second, that Stock-Hendel never received a negative performance review, and/or that Morales never counseled him regarding his performance, also cannot support a reasonable inference that Fox's stated motivation was implausible, as Stock-

23

Hendel suggests its can.  Finishing editors did not receive *any* formal performance reviews.  And that Fox had not previously experienced sufficient problems with Stock-Hendel's work to refer the issue to Morales, or that Stock-Hendel was generally good at his job, are not bases on which a jury could reasonably conclude it is *implausible* that, as part of an effort to cut costs—something Stock-Hendel does not dispute was occurring—Fox cut Stock-Hendel's shifts, as opposed to those of some other finishing editor, because DiPietro felt Stock-Hendel was slower *than other finishing editors* (rather than being generally slow or bad at his job).  (See *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1010 ["because [employee] was laid off as part of a company-wide reduction in force, the fact that he was terminated for minor issues alone does not raise an inference of age discrimination"].)  Finally, DiPietro's deposition testimony does not, as Stock-Hendel argues, support a reasonable inference that DiPietro's declared concerns about Stock-Hendel were "false."  The deposition testimony Stock-Hendel points to reflects that DiPietro was unable to estimate the exact amount of time Stock-Hendel spent asking questions, that DiPietro did not recall whether he identified this as a problem to others, and that DiPietro instead recalled only " 'venting' " to his colleagues about it.  None of this testimony contradicts DiPietro's declaration or supports a reasonable inference that it is false—especially where, as noted, it is undisputed that Fox did not have a formal review process for finishing editors.

In sum, even considering, as Stock-Hendel argues we should, evidence the court primarily considered at the pretext stage, and even though the burden on an age discrimination plaintiff is " 'not onerous' " at the prima facie stage (*Guz, supra*, 24 Cal.4th at p. 355), Fox has established that Stock-Hendel cannot meet this burden.  (See *Hersant, supra*, 57 Cal.App.4th at p. 1002 [prima

24

facie case requires, at a minimum, that the "employee offer circumstantial evidence such that a reasonable inference of age discrimination arises"].)  The court did not err in granting Fox summary adjudication on the issue.  Under the *McDonnell Douglas* framework, this is an independently sufficient basis for affirming the judgment.

## C.    *Stock-Hendel's Evidentiary Arguments*

Because the only portion of the reply compendium on which we rely is the Morales declaration, we need only consider whether the court erred in presumptively overruling an objection to that portion of the reply compendium.  We conclude above that the court did not abuse its discretion in presumptively overruling Stock-Hendel's objections to the reply compendium to the extent it contained the Morales declaration.

We decline to reach Stock-Hendel's remaining evidentiary objections, because even if Stock-Hendel is correct and the court improperly excluded and/or improperly permitted the various pieces of evidence he identifies, none of it would change our analysis on appeal.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.